UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM DRAKE, | No.  1:17-cv-01500-NODJ-SAB (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| SCOTT KERNAN, et al., | (ECF No. 134) |
| Defendant. | |

Plaintiff Sam Drake is proceeding pro se and  in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed April 5, 2023.

**I.**

**RELEVANT BACKGROUND**

After ruling on Defendants' exhaustion motion for summary judgment, this action proceeds on: 1) the conspiracy and failure to protect claims asserted against Defendants Allison and Moak; (2) the claim that Defendant Sexton directed Defendant Dr. McCabe to dispute all injuries reported by Plaintiff which had been caused by staff; (3) the claim that Defendant Sexton directed custody staff not to correct the safety and enemy information in Plaintiff's prison file; (4)

1

the claim that Defendant Navarro contaminated Plaintiff's food; and (5) the First Amendment retaliation and Eighth Amendment failure to protect claims asserted against Defendant Gonzales related to conduct occurring between April 6, 2015 through January 23, 2016. (ECF No. 106.)

On December 19, 2018, Defendants filed an answer to the second amended complaint.

On December 27, 2018, the Court issued the discovery and scheduling order.

On April 5, 2023, Defendants filed the instant motion for summary judgment. (ECF No. 134.) Plaintiff filed an opposition on July 13, 2023, and Defendants filed a reply on July 26, 2023. (ECF Nos. 138, 141.) Plaintiff filed a supplemental declaration on February 2, 2024. (ECF No. 143.)

**II.**

**LEGAL STANDARD**

**A.     Summary Judgment Standard**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine

2

issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at these Findings and Recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

**A.      Summary of Plaintiff's Complaint**

In 1994, Plaintiff was remanded to the custody of CDCR.  In June 2000, Plaintiff was a witness in a United States District Court and testified against CDCR and Corcoran State Prison corruption among prison staff.

Defendants Navarro, Gonzales, Allison, Moak, Sexton and McCabe agreed on a course of treatment to injure and oppress Plaintiff.

On April 6, 2015, Defendants Navarro and Gonzales conspired to murder and inflict serious bodily injury on Plaintiff.  Plaintiff was randomly moved from the security housing unit at Corcoran State Prison 4A facility to 4A2L where Defendants Navarro and Gonzales were posted.

On April 6, 2015 through May 2015, Plaintiff wrote requests complaining about the lack of in-cell air circulation, bedding, linen, and sink sanitation.  Plaintiff did not receive a response to his requests.

On April 23, 2015, under the auspice of enforcing CDCR security check, Gonzales stated in front of general population inmates that Plaintiff was a "SNY" "piece of shit" "rat" who has "been 'snitching' on us to the sergeant."

On May 5, 2015, Navarro called Plaintiff a "snitch" in front of general population inmates and stated: "Drake, in cell #48, keeps snitching on us [guards] to the sergeant and

captain…writing complaints," and "if you guys (e.g. black inmates) don't handle it, we are going to handle it!"  In addition, Gonzales called Plaintiff a "snitch" "SNY," "piece of shit" in front of the general population inmates.

On May 20, 2015, Defendants Gonzales and Navarro took Plaintiff from cell #48 to a hallway holding cage/cell to collect a urine sample from Plaintiff under the threat of discipline. Plaintiff told Defendants Gonzales and Navarro that he "filed a 602 against the Warden for his wasting human-resources by unnecessarily repeatedly drug-testing [him], a non-user because it is harassment."  Defendant Gonzales, without notice, left the 2 on one 1 escort, after hearing Plaintiff speak of having filed a staff complaint.  After Plaintiff provided a urine sample and was placed in a rotunda holding cage, Plaintiff asked Navarro, "Why am I not being taken back to my cell?" Navarro told Plaintiff "you have to wait here until my partner Gonzales is done searching your cell."  Gonzales remained in Plaintiff's cell for approximately thirty to forty minutes, ransacking Plaintiff's property then returned to the rotunda with two fifty-gallon trash bags and refused to disclose the contents.  When Plaintiff asked what items were taken, Gonzales stated, "you had a lot of trash! Just stand there and shut the fuck up! I read your legal papers, and what you write isn't worth shit! You are not on my level yet, I know exactly what to say in court to win!"  Gonzales further stated, "Oh, if you want to see 'personal,' I will get you struck-out! I have already gotten four prisoners life sentenced and I'll be glad to make you the fifth!" Gonzales then told Plaintiff to "turn around and cuff-up…if you so much as look at me, I will slam you onto the floor head first!"

On May 21, 2015, Gonzales threatened to charge Plaintiff for the lost state linen taken from a different prisoner's cell on May 20, 2015, if Plaintiff filed an inmate grievance regarding the search of his cell.

On May 21, 2015 and May 28, 2015, Gonzales filed two retaliatory Rule Violation Reports (RVR) against Plaintiff regarding the May 20, 2015 escort.  Gonzales accused Plaintiff of destroying state property and willfully resisting and delaying a peace officer in the performance of his duties.

On May 28, 2015, June 15, 2015, and June 18, 2015, Gonzales attempted to lure Plaintiff

out of his cell to be attacked during the night shift, and Plaintiff was unable to exit his cell for shower on these dates.

On June 23, 2015, Gonzales intimidated/threatened use of force against Plaintiff stating, "Do you want a problem! Make sure you spell my name correct, it won't be the first time I've been to court!"  On this same date, Plaintiff requested that different officers escort him from library to 4A2L.

On June 24, 2015, Defendants Navarro and Gonzales threatened to serve Plaintiff contaminated food.

On June 25-June 28, July 2, July 12, July 21, and July 23, 2015, Gonzales renewed his food poisoning threat stating, "You haven't seen anything yet, I haven't even started yet, this is only the beginning!"

On June 28, 2015, Gonzales told Plaintiff to prepare for the RVR hearing, and then told Plaintiff "wait, let me go see if the Lt. wants to deal with this shit."  Gonzales falsely told the Lieutenant that he "refused to attend" the hearing.  Plaintiff was not allowed to attend the RVR hearing, and Gonzales posted a disciplinary penalty sign on his cell door and took his television.

On June 29-30, 2015, Defendants Gonzales and Navarro disciplined Plaintiff outside of the disciplinary process by extending his penalty absent authorization of a disciplinary order.

On July 7, 2015, Gonzales threatened to pepper spray Plaintiff in the face when Plaintiff was transported from the law library to his cell unit.

On July 21, 2015 and July 23, 2015, Defendants Navarro and Gonzales repeatedly threatened to serve Plaintiff contaminated food.

On September 5, 2015, Defendant Gonzales stood at the Plaintiff's cell door and stated: "You have an 'R' suffix in your file right?  What does the 'R' stand for?  You are a sex-offender. My job here is to make the life of pieces of shit like you miserable!"

On September 8, 2015, Gonzales attempted to lure Plaintiff out of his cell to subject him to an assault/battery, and when Plaintiff declined, Gonzales stated: "That's too bad because it was going to be a long trip to nowhere!"  On this same date, Plaintiff wrote an emergency plea for help to the sergeant and the sergeant agreed to move Plaintiff to a different building.

On January 23, 2016, Gonzales threatened to have Plaintiff assaulted once he was released from segregation. Gonzales has a history of conspiring and targeting prisoners for violent attacks and retaliation.

On September 27, 2016, under the auspice of enforcing CDCR feeding regulation and to further the conspiracy, Navarro gave Plaintiff contaminated food. The following day, Plaintiff suffered severe abdominal pain, dysentery, and vomiting from consuming the food.

On October 6, 2016, Defendant Sexton directed staff not to amend or correct any of the false or incomplete safety/enemy placement case factor information in Plaintiff's central file and directed Defendant McCabe to dispute all of the injuries Plaintiff reported to the medical department.

On December 29-30, 2016, to further the conspiracy and under the auspices of enforcing CDCR feeding regulations, Navarro carried out the earlier threats and issued Plaintiff food heavily laden-tainted with odorless, nonvisible, and unknown contaminated substances. After consuming the food Plaintiff received from Navarro, he suffered nausea, vomiting, dysentery, acute pain in stomach and spleen, and swollen and hyper pigmented feet and ankles. Plaintiff reported the food poison exposure to custody, food service, and medical staff on January 1, 5, and 27, 2017. Plaintiff has suffered serious bodily injury inflicted by Navarro for approximately eight months.

In March 2017, Defendant Allison agreed to place Plaintiff in the general population where Defendants Navarro and Gonzales were posted. Defendant Allison had a meeting with Defendants Moak and Sexton to circumvent the Ashker settlement agreement terms and amend the CDCR prisoner placement regulations without appropriate notice. Defendant Allison also directed Defendants Moak and Sexton to disallow Plaintiff to attend the DRB placement review, and to erase all of Plaintiff's safety concerns following the Ashker monitoring conclusion thereby subjecting Plaintiff to attack by other prisoners.

In March 2017, Defendant Moak directed his subordinate counselors to conduct the pre-DRB interview without recording any of Plaintiff's statements, to not document any of Plaintiff's placement safety enemy concerns, to tell Plaintiff that he would be attending his DRB review, and

to submit the false interview report as a chrono disputing Plaintiff's safety placement restriction in support of Defendant Sexton's actions.  Defendant Allison signed over placement jurisdiction to Defendant Sexton.

In March 2017, Defendant McCabe directed his subordinate healthcare staff to refer Plaintiff to the mental health department for any reports of employee attacks or contamination of food and disputed Plaintiff's injuries stemming from exposure to contaminated food.

On June 26, 2017, Plaintiff submitted an inmate appeal.  On June 29, 2017, a video interview was conducted.

**B.     Statement of Undisputed Facts[1]**

1.     Plaintiff Drake has been incarcerated since 1994 and was housed at California State Prison-Corcoran (Corcoran) between 2013 and 2018.  (Pl. Dep., Ex. A at 15:1-13, 21:2-12.)

2.     Plaintiff testified in the United States District Court in June 2000, concerning misconduct at Corcoran in 1994.  (Pl. Dep., Ex. A at 17:18-18:13.)

3.     Plaintiff never discussed his June 2000 testimony with Defendants Allison, Moak, Sexton, Navarro or Gonzales.  (Pl. Dep., Ex. A at 18:23-19:16.)

4.     Plaintiff has never been validated as a prison gang member and is not affiliated with any gang members.  (Pl. Dep., Ex. A at 23:2-9.)

5.     Plaintiff had been subject to DRB control regarding his housing and transfers since September 17, 2014, prior to the Ashker v. Governor, N.D. Cal. No. C09-05796, settlement, when he was placed in the Security Housing Unit (SHU) at Corcoran on an indeterminate basis after rescinding his Sensitive Need Yard (SNY) status and requesting placement in the Psychiatric Services Unit (PSU).  (Allison Decl., Ex. D at 2:23-3:8; DRB memo, dated September 17, 2014, Ex. L.)

6.     The September 17, 2014 DRB memorandum referred to multiple reasons for this decision, including Plaintiff's refusal to cooperate with staff to find suitable housing, his failure to program at several SNY facilities, his desire to separate himself from the inmate population by characterizing himself as a "reformer, not a criminal," an inability to perform on the general

---

[1] Hereinafter referred to as "UF."

population or SNY facilities due to disciplinary behavior, and that his safety may be at risk if released to general population because of his commitment offense and years of SNY placement. (Allison Decl., Ex. D at 2:23-3:8; DRB memo, dated September 17, 2014, Ex. L.)

7.     The September 17, 2014 DRB memorandum directed that Plaintiff's case be re-submitted within twenty-four months and granted Corcoran the authority to transfer him to an SNY facility commensurate with his case factors and without the benefit of a DRB if Plaintiff began cooperating with staff and demonstrated a willingness to comply with SNY expectations. (Allison Decl., Ex. D at 2:23-3:8; DRB memo, dated September 17, 2014, Ex. L.)

8.     The settlement agreement in <u>Ashker</u> does not require a noticed hearing for the DRB to relinquish control over an inmate's housing in the SHU.  (Allison Decl., Ex. D at 3:24-27; Moak Decl., Ex. E at 2:21-24; <u>Ashker</u> settlement agreement, Ex. I, at ppg. 11:13-12:14.)

9.     Plaintiff's conspiracy claim is based on a March 2017 chrono written by Correctional Counselor Diaz, in which Plaintiff was interviewed and verbalized his safety concerns if housed on a general population yard.  (Pl. Dep., Ex. A at 25:2-28:-2; Chrono, Ex. B.)

10.     Plaintiff had rescinded his SNY status in 2013, after he arrived at Corcoran.  (Pl. Dep., Ex. A at 29:12-16.)

11.     Plaintiff expressed to Counselor Diaz that he wanted to remain on indeterminate status in the SHU.  (Pl. Dep., Ex. A at 29:17-20.)

12.     Counselor Diaz indicated that an investigation would be performed to determine whether the Plaintiff had any enemies at Corcoran.  (Pl. Dep., Ex. A at 29:25-30:5; Diaz Decl., Ex. M at 2:15-21.)

13.     Counselor Diaz ultimately concluded that the Plaintiff had unsubstantiated safety concerns on an SNY facility that were fabricated so that he could remain housed in the SHU. (Chrono, Ex. B; Diaz Decl., Ex. M at 2:15-24.)

14.     Counselor Diaz informed Plaintiff that the request for an interview came from "higherups," without mentioning Defendants Allison, Moak, or Sexton. (Pl. Dep., Ex. at 33:1-17, 40:1-7.)

15.     On May 5, 2017, Defendant Moak approved, and on May 15, 2017, Defendant

Allison approved Defendant Sexton's May 3, 2017 request for the DRB to relinquish control over Plaintiff's housing.  (Allison Decl., Ex. D at 3:28-4:16; Moak Decl., Ex. E at 2:25-3:3.)

16.     In 2017, Plaintiff was not being housed in the SHU because of a SHU-eligible offense.  (Allison Decl., Ex. D at 4:6-8.)

17.     Defendants Allison and Moak anticipated that Plaintiff would participate in a subsequent Institutional Classification Committee (ICC) at Corcoran, when he could provide input concerning his housing.  (Allison Decl., Ex. D at 3:24-28; Moak Decl., Ex. E at 2:14-16.)

18.     The ICC then transferred Plaintiff to a general population yard.  (Pl. Dep., Ex. A at 38:24-39:12.)

19.     After Plaintiff was released to general population, he was attacked on December 15, 2017, by four Black inmates he did not know and could not identify.  (Pl. Dep., Ex. A at 47:21-48:9.)

20.     Although Plaintiff had submitted complaints, notices, and memos regarding his safety concerns prior to the December 17, 2017 attack, none of the notes in his Central File indicated that he would be attacked by the four Black inmates who assaulted him on December 15, 2017.  (Pl. Dep., Ex. A at 46:20-48:18.)

21.     Plaintiff sustained no other attacks after the DRB relinquished jurisdiction over his case.  (Pl. Dep., Ex. A at 48: 16-18.)

22.     Defendants Allison, Moak, Sexton, and McCabe did not agree with Gonzales or instruct Gonzales to harm Plaintiff.  (Pl. Dep., Ex. A at 49:6-12.)

23.     Plaintiff has no information that Defendants Navarro and Gonzales agreed to harm Plaintiff on April 6, 2015.  (Pl. Dep., Ex. A at 95:3-22.)

24.     Plaintiff did not notice any contamination in his food on September 27, 2016.  (Pl. Dep., Ex. A at 102:18-21, 107:25-108:4.)

25.     Plaintiff did not observe Defendant Navarro place any contamination in his food on September 27, 2016, as the meals were prepared in the rotunda before being brought into the section where he was housed.  (Pl. Dep., Ex. A at 106:25-107:7.)

26.     Plaintiff does not know what Defendant Navarro placed in his food on December

1   29 and 30, 2016.  (Pl. Dep., Ex. A at 111:20-23, 114:20-22.)

2       27.   Plaintiff did not observe Defendant Navarro place any foreign substances in his

3   food on December 29 or 30, 2016.  (Pl. Dep., Ex. A at 112:18-23, 114:23-25.)

4       28.   Plaintiff did not observe or smell any foreign substances in his food on December

5   29 or 30, 2016.  (Pl. Dep., Ex. A at 112:5-17, 115:12-15.)

6       29.   Plaintiff claims that he experienced swollen, painful, hyper-pigmented ankles in

7   2017, as a result of the food poisoning.  (Pl. Dep., Ex. A at 117:20-118:13, 119:3-6.)

8       30.   When assigned to work in the SHU at Corcoran in 2016, correctional officers were

9   involved in serving meals to the inmates housed in that unit using the following procedure: pans

10   of food prepared by kitchen staff would be brought into the rotunda area on food carts, and the

11   correctional officers would transfer individual portions of food onto trays, utilizing kitchen

12   utensils, which would be provided to each inmate. The correctional officers then would deliver

13   the trays to the inmates through the food ports on their cell doors.  (Navarro Decl., Ex. G at 2:3-

14   10.)

15       31.   Plaintiff has no evidence that Defendant Sexton directed Defendant McCabe to

16   dispute injuries caused by staff at Corcoran.  (Pl. Dep., Ex. A at 131:15-132:12.)

17       32.   On December 15, 2017, Plaintiff was assaulted and was taken to Adventist

18   Hospital Bakersfield with multiple facial fractures and was evaluated by Dr. Freeman, and was

19   initially treated with high dose steroids to reduce swelling prior to surgical intervention. Dr.

20   Freeman intended to perform surgery to repair the facial fractures with internal fixation involving

21   metal plates, screws, etc., on December 20, 2017, but Plaintiff had refused, requesting a second

22   opinion concerning a bone graft.  (McCabe Decl., Ex. F at 2:27-3:8.)

23       33.   On January 2, 2018, Dr. McCabe requested the Utilization Management Nurse to

24   forward a Request for Services for a second opinion to California Correctional Health Care

25   Services (CCHCS) Utilization Management which responded on January 3, 2018, by stating that

26   CCHCS would not allow a second opinion consult unless requested by a medical provider for

27   specific medical reasons.  (McCabe Decl., Ex. F at 2:27-3:8.)

28       34.   Prior to April 6, 2015, Defendant Gonzales was unaware of any grievances

submitted by Plaintiff against Gonzales or correctional staff members concerning alleged deprivations of in-cell air circulation, bedding, linen, or sink sanitation.  (Gonzales Decl., Ex. H at 2:3-7.)

35.     Gonzales was not involved in selecting inmates to submit to urine tests. Officers at the Investigative Services Unit (ISU) selected the inmates required to submit to urine tests and instructed Correctional Officers such as Gonzales to escort them for the tests.  (Gonzales Decl., Ex. H at 2:11-13.)

36.     In May 2015, Plaintiff was housed in the SHU, and the practice at that time was to randomly search three cells each day, and to ensure that each cell was searched at least once a month, due to the enhanced security issues posed by inmates housed there. These searches were conducted when the inmate was out of the cell in order to maintain the safety of the officers as much as possible.  (Gonzales Decl., Ex. H at 2:14-22.)

37.     In 2015, Gonzales did not attempt to lure Plaintiff out of cell his for the purpose of having him attacked by other inmates, either in retaliation for protected conduct, as part of a conspiracy, or otherwise.  (Gonzales Decl., Ex. H at 3:6-8.)

**C.     Dismissal of Defendant Sexton**

On February 13, 2023, Defendants filed a statement of fact of Defendant Sexton's death on the record, and served Defendant Sexton's successor in interest.  (ECF No. 129).

Rule 25(a)(1) provides:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of statement of the fact of the death as provided for herein for the service of the motion, the action shall be dismissed as to the deceased party.

In order for the ninety-day period for substitution to be triggered, a party must formally suggest the death of the party upon the record and must serve other parties and nonparty successors or representatives of the deceased with a suggestion of death in the same manner as

1  required for service of the motion to substitute. Fed. R. Civ. P. 25(a)(1); Barlow v. Ground, 39

2  F.3d 231, 233 (9th Cir.1994). Thus, a party may be served the suggestion of death by service on

3  his or her attorney, Fed. R. Civ. P. 5(b), while non-party successors or representatives of the

4  deceased party must be served the suggestion of death in the manner provided by Rule 4 for the

5  service of a summons. Barlow v. Ground, 39 F.3d at 232-234.

6       Rule 25 requires dismissal absent a motion for substitution within the ninety-day period

7  only if the statement of death was properly served. Unicorn Tales, Inc., v. Bannerjee, 138 F.3d

8  467, 469-471 (2d. Cir.1998).

9       Defendant Sexton's successor in interest personally served with the statement of fact of

10  Sexton's death on the record on February 13, 2023 (ECF No. 133), and the ninety-day period

11  expired on May 15, 2023.  Because no motion for substitution was filed on or before May 15,

12  2023, Fed. R. Civ. P. 6(a)(1)(C), (d), the Court finds dismissal of Defendant Sexton is appropriate

13  pursuant to Rule 25(a).[2]  See Zanowick v. Baxter Healthcare Corp., 850 F.3d 1090, 1094 (9th Cir.

14  2017) (Rule 25(a)(1) requires dismissal of the action against the decedent if a motion for

15  substitution is not made by any party within 90 days after service of the notice); Cf. First Idaho

16  Corp. v. Davis, 867 F.2d 1241, 1242-1243 (9th Cir.1989) (affirming dismissal of state law claims

17  against a decedent in a removal case under Rule 25 where state law precluded entry of judgment

18  against a deceased party, and the plaintiff made no motion for substitution of a representative of

19  the decedent's estate); Weil v. Investment/Indicators, Research and Mgmt., Inc., 647 F.2d 18, 21 n

20  .5 (9th Cir.1981) (observing that "[a]lthough the [co-plaintiff's] death was suggested on the

21  record, no party ever moved for substitution of his legal representative in this action).

22      **D.**    **Analysis of Defendants' Motion**

23       Defendants argue they are entitled to summary judgment concerning these claims because

24  there was no conspiracy to harm Plaintiff, and Allison and Moak removed Plaintiff from

25  Departmental Review Board (DRB) oversight because: (1) Plaintiff no longer could be housed in

26  the Security Housing Unit (SHU) solely on the basis of his own request; and (2) overwhelming

27

28  [2] Because Defendant Sexton must be dismissed, the Court need not and will not address the merits of the claims
against him.

evidence had not been presented supporting an immediate threat to Plaintiff, as the Corcoran

Security Threat Group (STG) Unit had not discovered any information substantiating Plaintiff's

safety concerns, Plaintiff was unable to identify any individual who had personally threatened his

safety, Plaintiff again had rescinded his Sensitive Needs Yard (SNY) status, and there was no

information presented that Plaintiff faced a specific threat of harm from other inmates if placed in

the general population. When Plaintiff was attacked on December 15, 2017, the attack was carried

out by four inmates unknown to Plaintiff, who concedes that there was no information in his files

indicating that he would be attacked by those individuals. Consequently, Allison and Moak had

no reason to believe that Plaintiff would be attacked on December 15, 2017, and were not

subjectively deliberately indifferent to a substantial risk of serious harm to Plaintiff.  There is no

evidence that Navarro contaminated Plaintiff's food, and Plaintiff admits that he was not attacked

as a result of Gonzales' alleged statements. Gonzales also did not take adverse action against

Plaintiff in retaliation for protected conduct and legitimate correctional concerns support his

alleged conduct in several respects. Alternatively, Allison and Moak are entitled to qualified

immunity concerning the failure to protect claim as it is not clearly established that they may not

rely on information provided by other peace officers in determining whether to relinquish DRB

oversight over Plaintiff's housing. For these reasons, this motion should be granted.

In opposition, Plaintiff argues, *inter alia*, that Defendants are not entitled to summary

judgment because there was a course of conduct to injure Plaintiff (e.g., to have Plaintiff placed

where he would be attacked physically by green wall guards or by inmates deployed by green

wall guards and to have his sentence increased by disciplinary action).  Defendants knowingly

disregarded an excessive risk of harm to Plaintiff's safety by approving him for non-security

housing unit general population, double cell, housing placement.

The Court will address each claim separately below.

### 1.   Conspiracy

Plaintiff contends that Defendants Allison and Moak agreed to harm him because of his

commitment offense, status as a sex offender, and grievances filed by him.

Conspiracy under § 1983 requires proof of "an agreement or meeting of the minds to

violate constitutional rights," <u>Franklin v. Fox</u>, 312 F.3d 423, 441 (9th Cir. 2002) (internal

quotation marks omitted) (quoting <u>United Steelworkers of Am. v. Phelps Dodge Corp.</u>, 865 F.2d

1539, 1540-41 (9th Cir. 1989)), and that an " 'actual deprivation of his constitutional rights

resulted from the alleged conspiracy,' " <u>Hart v. Parks</u>, 450 F.3d 1059, 1071 (9th Cir. 2006)

(quoting <u>Woodrum v. Woodward County</u>, 866 F.2d 1121, 1126 (9th Cir. 1989)). " 'To be liable,

each participant in the conspiracy need not know the exact details of the plan, but each participant

must at least share the common objective of the conspiracy.' " <u>Franklin</u>, 312 F.3d at 441 (quoting

United Steelworkers, 865 F.2d at 1541). A plaintiff must allege facts with sufficient particularity

to show an agreement or a meeting of the minds to violate the plaintiff's constitutional rights.

<u>Miller v. Cal. Dep't of Soc. Servs.</u>, 355 F.3d 1172, 1177 n.3 (9th Cir. 2004) (citing <u>Woodrum</u>,

866 F.2d at 1126). The mere statement that defendants "conspired" is not sufficient to state a

claim. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555).

 The Ninth Circuit requires a plaintiff alleging a conspiracy to violate civil rights to "state

specific facts to support the existence of the claimed conspiracy." <u>Olsen v. Idaho State Bd. of</u>

<u>Med.</u>, 363 F.3d 916, 929 (9th Cir. 2004) (citation and internal quotation marks omitted)

(discussing conspiracy claim under § 1985); <u>Burns v. County of King</u>, 883 F.2d 819, 821 (9th

Cir. 1989) ("To state a claim for conspiracy to violate one's constitutional rights under section

1983, the plaintiff must state specific facts to support the existence of the claimed conspiracy."

(citation omitted)).

 It is undisputed that Plaintiff's conspiracy claim is based on a March 2017 chrono written

by Correctional Counselor Diaz, in which Plaintiff was interviewed and verbalized his safety

concerns if housed on a general population yard.  (UF 9.)  At his deposition, Plaintiff admitted

that he had no information that Defendant Moak participated in a conspiracy to harm him other

than Moak's signature on the DRB report and the comment by Diaz regarding "higher-ups,"

without mention or reference to Defendants Allison, Moak, or Sexton.  (Pl. Dep., Ex. A at 33:1-

17, 40:1-7, 126:13-127:2.)  Although Plaintiff testified that the conspiracy to injure him was also

based on his interactions with Defendants Gonzales and Navarro in 2015 (Pl. Dep., Ex. A at

14

40:15-19), he admitted that Defendants Allison, Moak, Sexton, and McCabe did not agree with Gonzales or instruct Gonzales to harm Plaintiff and he has no information that Defendants Navarro and Gonzales agreed to harm him on April 6, 2015. (UF 23-24.)  At his deposition, Plaintiff could not identify any specific person who threatened his safety when interviewed by Diaz on March 20, 2017. (Pl. Dep., Ex. A at 28:3-16; Chrono Ex. B; Diaz Decl., Ex. M at 2:16-17.  It is undisputed that Plaintiff had rescinded his SNY status in 2013, after he arrived at Corcoran. (UF 10.)  Plaintiff expressed to Counselor Diaz that he wanted to remain on indeterminate status in the SHU. (UF 11.)  Counselor Diaz indicated that an investigation would be performed to determine whether the Plaintiff had any enemies at Corcoran. (UF 12.) Counselor Diaz ultimately concluded that the Plaintiff had unsubstantiated safety concerns on an SNY facility that were fabricated so that he could remain housed in the SHU. (UF 13.) Counselor Diaz informed Plaintiff that the request for an interview came from "higherups," without mentioning Defendants Allison and Moak. (UF 14.)

Plaintiff has not produced evidence that Defendants Allison and Moak met or agreed to circumvent the settlement agreement in Ashker v. State of California or CDCR regulations with respect to Plaintiff, or that Allison directed Moak to prevent Plaintiff from attending a DRB placement review or otherwise exclude him from the DRB review process and provided no such instructions to Moak.  Although Plaintiff cites to "allegations" that Defendants labeled him as a snitch, and sex offender to the general population (ECF No. 138 at 11:13-20), he provides no evidence that Defendants did so, or reached any agreement among themselves or with others to have Plaintiff attached.  Rather, the only evidence submitted by Plaintiff concerns statements attributed to Defendant Gonzales. (ECF No. 138 at 102-105.)  However, Plaintiff admits that the other Defendants did not agree with or instruct Gonzales to harm Plaintiff. (ECF No. 138 at 18, Fact 35.)  Accordingly, there is simply no evidence that Defendant Allison agreed with Moak or anyone else, that Plaintiff would be housed where he could be attacked by prisoners after the Ashker monitoring concluded in the August-September 2017 time frame.  See Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998) (to survive summary judgment on a conspiracy claim, a party must provide material facts showing an agreement among the conspirators to deprive the party of

1  their rights); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.1989) (unsupported conclusory

2  allegations are insufficient to preclude summary judgment).   Plaintiff must submit more than

3  mere allegations to show a genuine issue of fact as to whether there was a meeting of the minds to

4  support conspiracy. See Nwandu v. Bach, Case No. 06CV0999 MMA (WMc), 2010 WL

5  2486771, at *13 (S.D. Cal. Apr.21, 2010) ("Although the existence of a conspiracy may be

6  inferred from circumstantial evidence, Plaintiff has not offered any evidence beyond the

7  allegations in his complaint to raise a triable issue as to whether Defendants had a 'meeting of the

8  minds' to violate his constitutional rights."); Pool v. Multnomah County, Case No. CIV. 99–597–

9  AS, 2000 WL 1364229, at *7 (D.Or. Sept.6, 2000) ("[T]he mere similarity of conduct among

10  various persons and the fact that they may have associated with each other, may have assembled

11  together and may have discussed some common aims and interests, is not necessarily proof of the

12  existence of a conspiracy.") (citing Gilbrook v. City of Westminster, 177 F.3d 839, 860 (9th Cir.

13  1999)).   Accordingly, the Court concludes that there are no material facts in dispute and

14  Defendants Allison and Moak are entitled to judgment as a matter of law as to Plaintiff's

15  conspiracy claim.

16          2.      Failure to Protect-Defendants Allison and Moak

17          Plaintiff contends that Defendants Allison and Moak failed to protect him prior to the

18  December 15, 2017, attack.

19          The failure of prison officials to protect inmates from attacks by other inmates may rise to

20  the level of an Eighth Amendment violation only when: (1) the deprivation alleged is

21  "objectively, sufficiently serious;" and (2) the prison officials had a "sufficiently culpable state of

22  mind," acting with deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal

23  quotations omitted). "Deliberate indifference entails something more than mere negligence . . .

24  [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or

25  with knowledge that harm will result." Id. at 835. The official must both be aware of facts from

26  which the inference could be drawn that a substantial risk of serious harm exists, and he must also

27  draw the inference. Id. at 837; Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

28  If a defendant should have been aware of the risk of substantial harm but was not, that defendant

1  has not violated the Eighth Amendment, no matter how severe the risk. <u>Gibson v. County of</u>

2  <u>Washoe</u>, 290 F.3d 1175, 1188 (9th Cir. 2002).

3          Here, Defendants Allison and Moak, declare under penalty of perjury, that they approved

4  Sexton's May 3, 2017 request for the DRB to relinquish control over Plaintiff's housing because:

5  (1) Plaintiff no longer qualified for SHU status, as he no longer could be housed in the SHU

6  solely on the basis of his own request; and (2) overwhelming evidence had not been presented

7  supporting an immediate threat to the security of the institution or the safety of others, including

8  Plaintiff, as the Corcoran STG Unit had not discovered any information substantiating Plaintiff's

9  safety concerns, Plaintiff was unable to identify any individual who had personally threatened his

10  safety, Plaintiff again had rescinded his SNY status, there was no information presented that the

11  Plaintiff faced a specific threat of harm from other inmates if placed in the general population,

12  and Plaintiff had been able to successfully house with other inmates in the past. (Allison Decl.,

13  Ex. D at 3:28-4:16; Moak Decl., Ex. E at 2:25-3:3.)

14          Prior to this approval, Plaintiff had been interviewed by Counselor Diaz on March 20,

15  2017, and he could not identify a specific person who posed a threat to his safety at that time.  (Pl.

16  Dep., Ex. A at 28:3-16; Chrono Ex. B; Diaz Decl., Ex. M at 2:16-17.)   Plaintiff expressed to

17  Counselor Diaz that he wanted to remain on indeterminate status in the SHU.  (UF 11.)

18  Counselor Diaz indicated that an investigation would be performed to determine whether the

19  Plaintiff had any enemies at Corcoran.  (UF 12.)  Counselor Diaz ultimately concluded that the

20  Plaintiff had unsubstantiated safety concerns on an SNY facility that were fabricated so that he

21  could remain housed in the SHU.  (UF 13.)  Counselor Diaz informed Plaintiff that the request for

22  an interview came from "higherups," without mentioning Defendants Allison or Moak. (UF 14.)

23  Although Plaintiff had submitted complaints, notices, and memos regarding his safety concerns

24  prior to the December 17, 2017 attack, none of the notes in his Central File indicated that he

25  would be attacked by the four Black inmates who assaulted him on December 15, 2017.  (UF 20.)

26  Thus, Defendants Allison and Moak had no reason to believe Plaintiff would be attacked on

27  December 15, 2017, and could not have been deliberately indifferent to a substantial risk of

28  serious harm to Plaintiff.  Indeed, this finding is supported by the fact that Defendants submit

1    evidence Plaintiff later claimed the December 15, 2017 attacked occurred because non-party

2    Lieutenant Brown told inmate program clerk Houston about Plaintiff's "R" suffix (notation that

3    Plaintiff was convicted of a sex offense), and encouraged Houston to arrange an attack on

4    Plaintiff, along with non-party LTA Carmichael.  (ECF No. 134-3, Ex. C, Appeal, Log No.

5    CSPC-5-18-00204.)

6         Plaintiff claims that Defendants Allison and Moak both knew the obviousness of the risk

7    faced by Plaintiff if released to general population, and that he would be attacked at some point in

8    time (ECF No. 138 at 14:26-15:2), such contention does raise an issue of material fact.  In order

9    to succeed on a claim of deliberate indifference, Plaintiff must establish that the office was both

10   aware of facts from which the inference could be drawn that a substantial risk of serious harm

11   exists and actually drew such inference.  Farmer v. Brennan, 511 U.S. at 837; Valandingham v.

12   Bojorquez, 866 F.2d at 1138.  Simply alleging that Defendants should have been aware of the risk

13   of substantial harm but were not, does not demonstrate an Eighth Amendment violation.  Gibson

14   v. County of Washoe, 290 F.3d at 1188.

15        Plaintiff admits that on December 15, 2017, he was attached by four black inmates he

16   could not identify.  (ECF No. 138 at 17:10-12.)  While Plaintiff attempts to dispute that none of

17   the notes in his central file indicated he would be attacked by these specific individuals,

18   Plaintiff's deposition testimony states otherwise.  (ECF No. 138 at 17:14-23; but cf. ECF No.

19   134-3, Pl. Dep. at 42:10-15, 46:20-48:18); see Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262,

20   266 (9th Cir. 1991) (a party cannot create an issue of fact by contradicting their own deposition

21   testimony).  In addition, Plaintiff presents no evidence from his central rile referencing these

22   individuals.

23        Further, there is no evidence that Defendants Allison or Moak actually made a decision to

24   release him to general population prior to the attack.  Rather, it is undisputed that Defendants

25   Allison and Moak merely approved a recommendation that Plaintiff's case be referred to an

26   Institutional Classification Committee for review.  (ECF No. 134-3 at 88-89.)  As Plaintiff

27   acknowledges, his case subsequently was heard by an Institutional Classification Committee on

28   August 16, 2017, which noted possible safety concerns based on a July 26, 2016 memorandum.

(ECF No. 138 at 59; see also ECF No. 138 at 98-99.) The Committee then elected to refer Plaintiff's case back to an Institutional Gang Investigator (IGI) for an updated evaluation, after which Plaintiff would be reviewed again for an appropriate transfer. (Id.) Neither Allison nor Moak were involved in this Committee. (Id.) Plaintiff's transfer to general population and the subsequent attack on December 15, 2017, occurred only after these steps were completed. Since Allison and Moak did not make the final decision to transfer Plaintiff to general population, they did not violate the Eighth Amendment in this case. Further, because of these intervening investigations and decisions, there is no causation between their decision to relinquish Department Review Board control over Plaintiff's housing and the attack in question. Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

Plaintiff denies that he was unable to identify a specific person who threatened his safety to Counselor Diaz on March 20, 2017 (ECF 138 at 12:8-13), but Plaintiff fails to specify who was identified to Diaz, whether this person was housed at the same institution as Plaintiff, or that this person participated in the December 15, 2017 attack. Even assuming that Plaintiff had identified a specific person to Counselor Diaz, it is undisputed that Defendants Allison and Moak relied upon the information in Diaz's March 20, 2017 memorandum that Plaintiff was unable to identify a specific threat to his safety. (ECF 134-3 at 77:9-78:17, 94:5-95:5.)  Prison officials are entitled to rely upon information supplied by other officials. See Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005) (en banc), rev'd on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012) (en banc)).

In support of his claim, Plaintiff references a 2016 confidential investigation conducted by Sergeant J. Sherman.  However, after investigation, it was concluded that Plaintiff's claim he had received a "kite" from a Two-Five gang member containing a new threat to his safety had been fabricated and Plaintiff's safety concerns could not be corroborated.  (ECF No. 141, Ex. P, Classification Review at pg. 7.)  The Classification Review completed on July 11, 2016 concluded that Plaintiff did not have verified safety concerns as of that time, just as Diaz did on March 20, 2017. (Id.; ECF No. 134-3 at 219.)  Consequently, reviewing these documents would not have advised Defendants that Plaintiff was likely to be attacked if released to general

1   population and Defendants are not liable. Gibson, 290 F.3d at 1188.

2        Moreover, the evidence submitted by Plaintiff documenting the existence of enemies after

3   the December 15, 2017 incident does not establish that Defendants were on notice of these

4   enemies prior to that date. (ECF 138 at 117-120.)

5        Lastly, to the extent Plaintiff argues that Defendants circumvented the settlement in

6   Ashker v. Governor or CDCR regulations with respect to Plaintiff's case, such argument fails.

7   The settlement agreement in Ashker does not require a noticed hearing for the DRB to relinquish

8   control over an inmate's housing in the SHU.  (UF 8.)  Indeed, the relinquishment of DRB control

9   anticipated that Plaintiff subsequently would attend an ICC to discussing his housing placement,

10  wherein Plaintiff could provide further information.[3]  (UF 17.)  After that settlement, the criteria

11  for an inmate being housed on Administrative Security Housing Unit (SHU) status changed,

12  requiring a finding by the DRB that there was overwhelming evidence supporting an immediate

13  threat to the security of the institution or the safety of others, and substantial justification had

14  been articulated of the need for SHU placement. (ECF 138 at 48:14-18; see also Allison Decl.,

15  ECF 134-3 at 76:11-17.) An inmate also could be placed on Administrative SHU status if there

16  was a substantial disciplinary history consisting of no less than three SHU terms within the past

17  five years, and the DRB articulated a substantial justification for the need for a continued SHU

18  placement due to the inmate's ongoing threat to the safety and security of the institution and/or

19  others, and that the inmate cannot be housed in a less restrictive environment. (ECF 138 at 48:18-

20  24.) Under this settlement, an inmate no longer could be placed on SHU status solely on the basis

21  of their own request. (ECF 134-3 at 76:11-13.)

22       The DRB found in May 2017, that there was not overwhelming evidence supporting an

23  immediate threat to the institution, to Plaintiff, or to others, as the March 20, 2017 Diaz

24  memorandum noted that Plaintiff was unable to identify any individual who had threatened his

25  safety and the Corcoran Strategic Threat Group (STG) Unit had not discovered any specific

26  ───────────────

27  [3] In addition, violation of state prison rules and regulations, without more, does not give rise to a claim under section 1983.  Ove v. Gwinn, 264 F.3d 817, 824 (9th Cir. 2001); Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997).

28

1   information substantiating Plaintiff's concerns. (Id. at 77:9-18.) Also, as of August 16, 2017,

2   Plaintiff had received only one SHU term within the preceding five years on January 23, 2013,

3   for threatening staff. (ECF 138 at 59.) The only basis for retaining Plaintiff on Administrative

4   SHU Status was his own request, which was no longer permitted under the Ashker settlement.

5   Thus, relinquishing DRB control in May 2017 did not violate the Ashker settlement.

6          Irrespective, even if Defendants had violated the settlement agreement, Plaintiff may not

7   seek relief in this section 1983 action. See Frost v. Symington, 197 F.3d 348, 353 (9th Cir. 1999)

8   (where litigant seeks enforcement of a consent decree, litigant must proceed through class counsel

9   in the action in which the consent decree entered).[4]

10         In sum, Plaintiff fails to establish that Defendants were aware that Plaintiff would be

11   attacked and Defendants are not liable for violating the Eighth Amendment, and they are entitled

12   to summary judgment.

13         3.      Failure to Protect-Defendant Gonzales

14         Plaintiff contends that Defendant Gonzales failed to protect him from the December 15,

15   2017, assault.

16         The failure of prison officials to protect inmates from attacks by other inmates may rise to

17   the level of an Eighth Amendment violation only when: (1) the deprivation alleged is

18   "objectively, sufficiently serious;" and (2) the prison officials had a "sufficiently culpable state of

19   mind," acting with deliberate indifference. Farmer v. Brennan, 511 U.S. at 834 (internal

20   quotations omitted). "Deliberate indifference entails something more than mere negligence . . .

21   [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or

22   with knowledge that harm will result." Id. at 835. The official must both be aware of facts from

23   which the inference could be drawn that a substantial risk of serious harm exists, and he must also

24   draw the inference. Id. at 837; Valandingham v. Bojorquez, 866 F.2d at 1138. If a defendant

25   should have been aware of the risk of substantial harm but was not, that defendant has not

26   _____

    [4] To the extent that Defendants did not comply with other prison regulations concerning determination of
27   his classification and housing, such contention does not support a claim under section 1983. Ove v. Gwinn, 264 F.3d
    817, 824 (9th Cir. 2001); Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (violations of state
28   prison rules and regulations, without more, do not support any claims under § 1983).

1    violated the Eighth Amendment, no matter how severe the risk. Gibson v. County of Washoe, 290

2    F.3d at 1188.

3         At his deposition, Plaintiff conceded that the alleged conduct of Defendant Gonzales did

4    not result in any attacks on Plaintiff.  (Pl. Dep. at 49:13-16.)  Plaintiff alleges that Defendant

5    Gonzales referred to him as an "SNY," "piece of shit," and a "rat" in front of other inmates.

6    However, because admittedly these statements did not result in an attack on Plaintiff, he could not

7    and did not sustain any damages caused by these statements, and Plaintiff's claims fails on the

8    merits.  See Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008) (in a § 1983

9    case, the plaintiff must demonstrate that the defendant's conduct was the actionable cause of the

10   claimed injury); Arnold v. International Business Machines Corp., 637 F.2d 1350, 1355 (9th Cir.

11   1981) ("The causation requirement of section[ ] 1983 ... is not satisfied by a showing of mere

12   causation in fact.... Rather, the plaintiff [also] must establish proximate or legal causation."

13   (citation omitted)).  Accordingly, Defendant Gonzales is entitled to summary judgment on this

14   claim.[5]

15        4.      Contamination of Food-Defendant Navarro

16        The Eighth Amendment's prohibition against cruel and unusual punishment protects

17   prisoners not only from inhumane methods of punishment but also from inhumane conditions of

18   confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v.

19   Brennan, 511 U.S. at 847 and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (quotation marks

20   omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must

21   not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing

22   Rhodes, 452 U.S. at 347) (quotation marks omitted). Thus, conditions which are devoid of

23   legitimate penological purpose or contrary to evolving standards of decency that mark the

24   progress of a maturing society violate the Eighth Amendment. Morgan, 465 F.3d at 1045

25   _____

26   [5] To the extent Plaintiff contends that Defendant Gonzales encouraged Defendant Navarro to give him poisoned food
     and thereby failed to protect him, such claim fails because as explained below in section D(4), there is no genuine
     issue of material fact as to whether Navarro poisoned Plaintiff's failed.  Consequently, Defendant Gonzales cannot be

27   liable for failing to protect Plaintiff from poisoned foods when he cannot prove that he was poisoned.

28

1  (quotation marks and citations omitted); Hope v. Pelzer, 536 U.S. 730, 737 (2002); Rhodes, 452

2  U.S. at 346.

3       A prison official violates the Eighth Amendment only if two requirements are met: (1) the

4  deprivation alleged must be, objectively, sufficiently serious, and (2) the prison official possesses

5  a sufficiently culpable state of mind. Farmer v. Brennan, 511 U.S. at 834. In prison-conditions

6  cases, the requisite state of mind to establish an Eighth Amendment violation is one of deliberate

7  indifference to inmate health or safety. Id.  A prison official is deliberately indifferent if he knows

8  that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take

9  reasonable steps to abate it. Id. at 837, 844. The official must both be aware of facts from which

10 the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

11 the inference. Id. at 837.

12      In order to establish a claim for damages against an individual prison official under §

13 1983, a plaintiff also must set forth evidence showing that the specific prison official's deliberate

14 indifference was the "actual and proximate cause" of the deprivation of plaintiff's Eighth

15 Amendment rights. Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).

16      Here, it is undisputed that Plaintiff did not notice any contamination in his food on

17 September 27, 2016.  (UF 24.)  Plaintiff admits he did not observe Defendant Navarro place any

18 contamination in his food on September 27, 2016, as the meals were prepared in the rotunda

19 before being brought into the section where he was housed.  (UF 25.)  Plaintiff also does not

20 know what Defendant Navarro placed in his food on December 29 and 30, 2016.  (UF 26.)

21 Plaintiff admittedly did not observe Defendant Navarro place any foreign substances in his food

22 on December 29 or 30, 2016.  (UF 27.)  Nor did Plaintiff observe or smell any foreign substances

23 in his food on December 29 or 30, 2016.  (UF 28.)  Plaintiff claims that he experienced swollen,

24 painful, hyper-pigmented ankles in 2017, as a result of the food poisoning.  (UF 29.)  When

25 assigned to work in the SHU at Corcoran in 2016, correctional officers were involved in serving

26 meals to the inmates housed in that unit using the following procedure: pans of food prepared by

27 kitchen staff would be brought into the rotunda area on food carts, and the correctional officers

28 would transfer individual portions of food onto trays, utilizing kitchen utensils, which would be

provided to each inmate. The correctional officers then would deliver the trays to the inmates through the food ports on their cell doors.  (UF 30.)

In support of his argument, Plaintiff submits the declaration of fellow inmate Kevin Fields who declares, inter alia, that on June 15, 2015, he overheard Gonzales making statements about giving Plaintiff a "special meal" known to contain contaminates, and he opines that Gonzales had the means to actually contaminate Plaintiff's meal.  (ECF No. 138, Fields Decl. 108:28-110:2.) Although Plaintiff's operative complaint alleges that Plaintiff was poisoned on September 27, 2016, December 29, 2016, and December 30, 2016 (ECF No. 26 at 9:1-3), Fields' declaration relates to events which took place on a different date-June 15, 2015, over one year later.  (ECF No. 138 at 108:28-110:2.)  Further, Fields admits that he does not know if Plaintiff's food was contaminated on that day.  (Id. at 109:26-28.)  Moreover, Fields declaration primarily relates to conduct by Defendant Gonzales, not Navarro.  Likewise, the declaration by Gabriel Covarrubias relates to an event which took place on a different date-June 25, 2015, over one year later, involves conduct only by Defendant Gonzales, and does not state that he actually knew Plaintiff's food was contaminated on that day.  (Id. at 112.)

Plaintiff may well believe that his medical problems were caused by food poisoning. However, his pleadings contain no basis for this belief other than surmise or conjecture on his part. As a layperson Plaintiff is not trained and qualified to make such a diagnosis, and there is no diagnosis of any food borne illness. Plaintiff is not a physician or medical expert and has alleged no facts showing that he is otherwise qualified to opine on the whether he suffered from a food borne illness.  See, e.g., Van Buren v. Diaz, No. 1:13-cv-00516-MSJ (PC), 2013 WL 3773870, at *3 (E.D. Cal. July 17, 2013) (prisoner failed to state a deliberate indifference claim based on conjecture that he suffered from food poisoning where pleadings did not reflect that plaintiff was "trained and qualified to make such a diagnosis"); Williams v. Rodriguez, 1:09-cv-01882-LJO-GSA-PC, 2012 WL 2339742, at *7 (E.D. Cal. June 19, 2012) ("While Plaintiff has described symptoms he suffered, Plaintiff is not qualified to make a medical diagnosis, and his conclusion that he was being poisoned, without more, does not support a claim.").  Accordingly, Defendant Navarro is entitled to summary judgment on this claim.

5.      Dispute of Plaintiff's Injuries-Defendant Dr. McCabe

Plaintiff contends that Sexton directed Dr. McCabe to dispute injuries caused by staff at Corcoran.

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (citation omitted).

"A medical need is serious if failure to treat it will result in significant injury or the unnecessary and wanton infliction of pain." Peralta v. Dillard, 744 F.3d 1076, 1081 (9th Cir. 2014) (citation and internal quotation marks omitted). "Indications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014).

Plaintiff admits that he has no evidence that Defendant Sexton directed Defendant McCabe to dispute injuries caused by staff at Corcoran. (UF 31; ECF No. 138 at 20:25-28.) Indeed, at his deposition, Plaintiff testified that he did not have evidence to support such claim. (Pl. Dep., Ex. A at 131:15-132:12.) Further, Dr. McCabe declares that no such instructions were given. (McCabe Decl. Ex. F at 2:7-8.) Moreover, Plaintiff was provided with medical treatment for the injuries he sustained at Corcoran. (UF 32; McCabe Decl., Ex. F at 2:9-17; 2:18-26; 2:27-3:8; 3:9-16; Pl.'s Unit Health Records, Ex. J Indeed, Plaintiff submits multiple documents demonstrating that he did, in fact, receive medical treatment for his injuries. (ECF No. 138 at 134, 143-144, 148, 152-158, 162-163.) Plaintiff was also referred to the mental health

1   department.  (McCabe Decl., Ex F at 2:18-26; 3:9-16; Pl.'s Unit Health Records, Ex. J.)

2        Although Plaintiff continues to claim that Dr. McCabe is liable for deliberate indifference

3   to a serious medical need (ECF No. 138 at 34:16-35:18), this claim was dismissed, without

4   prejudice, as unexhausted.  (ECF No. 106.)  Nonetheless, the undisputed facts demonstrate that

5   Plaintiff was provided with treatment on multiple occasions for both the alleged food poisoning

6   as well as the injuries sustained on December 15, 2017.  (ECF No. 134-3 at 103-126.)  Thus, the

7   medical records before the Court demonstrates that medical staff, including Dr. McCabe, were

8   responsive to Plaintiff's medical needs.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1057-1061

9   (9th Cir. 2004) (affirming summary judgment in favor of defendants where the evidence

10  demonstrated that defendants had treated the inmate's condition and were responsive to his

11  medical needs).  Plaintiff has not submitted evidence that Sexton directed Dr. McCabe to dispute

12  Plaintiff's injuries, which were appropriately treated, and Dr. McCabe is entitled to summary

13  judgment.

14       To the extent Plaintiff relies on Dr. McCabe's responses to his health care grievances in

15  support of his argument, his argument fails.  As an initial matter, the mere denial of a health care

16  grievances, alone, does not demonstrate deliberate indifference.  Buckley v. Barlow, 997 F.2d

17  494, 495 (9th Cir. 1993)  Furthermore, the denial by Dr. McCabe does not create a genuine issue

18  of material fact as to whether Sexton directed him to dispute Plaintiff's injuries.  In denying

19  Plaintiff's health care grievance Log No. COR HC 17061994 at the second level of review on

20  May 18, 2017, Dr. McCabe noted, in pertinent, as follows:

21       **Issue 1:**  Your request to see a podiatrist for your swollen foot was partially granted.

22
     •  You were seen by podiatry on 6/5/2017 in which the podiatrist noted no edema
23   (swelling).  However, a skin condition was noted on your feet.  The podiatrist offered
     antifungal cream and Lotrisone cream to treat the condition, but you refused.  The
24   podiatrist recommended a referral to the dermatologist to address your skin condition(s).
     The referral was completed and your appointment is pending.
25   **Issue 2:**  Your request to see a vascular specialist for damaged veins is still not medically
     warranted as your provider noted there was no significant vascular disease during your
26   medical exam on 4/26/2017.

27
     **Issue 3:**  Your request to see a dermatologist for your nail growth is partially granted in
28

that you have a pending appointment with Dermatology to address your onycholysis symptoms.

**Issue 4:**  Your request to see an immunologist for your damaged immune system (low WBC) remains denied.

• You were last seen for this issue on 6/5/2017 in which your provider noted your last white blood cell count was 3.3 which is essentially within normal limits.  Your provider did order labs to recheck your blood counts, but lab records indicate your refused this blood draw.  If you would like to reschedule the blood draw please submit a Health Care Services Request Form (CDC 7362) to Medical.

**Issue 5:**  Your request [for] a heavy metal panel and mycotoxin test was partially granted in that you had labs drawn to check for lead and the labs came back as essentially within normal limits with no follow up.

**Issue 6:**  Your request [for] vitamin C, biotin, omega (3, 6, 9), bottled water, lycopene, and beet juice remains denied as your providers have not noted any indication for these supplements at this time.

**Issue 7:**  Your request CDCR adopt policy and practices for poison control and exposure remains partially granted as stated in the First Level Response.

(ECF No. 138 at 143-144, Ex. O.)  Dr. McCabe's response to Plaintiff's health care grievance negates Plaintiff's argument Dr. McCabe directed his subordinates to refer Plaintiff to mental health whenever he reported being poisoned by prison officials.  (ECF No. 138 at 21.)  Dr. McCabe's response indicates  the medical treatment Plaintiff was provided and the reasons why certain treatment was denied.  As such, this does not support Plaintiff's contention that Sexton told Dr. McCabe to falsify documents as the extend of Plaintiff's injuries.  Furthermore, Plaintiff's argument that the way Dr. McCabe treated him "was degrading, humiliating, and constitutionally inadequate," (ECF No. 138 at 21:15-16), does not support a finding that Dr. McCabe instructed his subordinates to dispute Plaintiff's injuries and simply refer him to mental health.  Patterson v. Kern County Sheriff's Office, No. 1:12-cv-0132-MJS (PC), 2012 WL 1067196, *7 (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992). ("The Eighth Amendment does not require that prisoners receive 'unqualified access to health care.' ")  That is so because " '[v]erbal harassment or abuse ... is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.' " Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (quoting Collins v.

1   Cundy, 603 F.2d 825, 827 (10th Cir. 1979); Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996)

2   (stating that "verbal harassment generally does not violate the Eighth Amendment"); Gaut v.

3   Sunn, 810 F.2s 923, 925 (9th Cir. 1987); Garbarini v. Ulit, No. 1:14-cv-01058-AWI-SAB (PC),

4   2017 WL 4224947, at *20 (E.D. Cal. Sept. 11, 2017) ("even if Defendant Moon was rude and

5   hostile this would not rise to the level of deliberate indifference"); Acuna v. Ikegbu, No. 14–CV–

6   03651–JCS (PR), 2014 WL 7183702, at *3 (N.D. Cal. Dec. 15, 2014) (yelling at a patient may be

7   rude but does not show deliberate indifference).  Accordingly, summary judgment should be

8   granted in favor of Defendant Dr. McCabe.

9            6.      Retaliation-Defendant Gonzales

10          Plaintiff contends that Defendant Gonzales retaliated against him for filing inmate

11   grievances.

12          "Prisoners have a First Amendment right to file grievances against prison officials and to

13   be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012)

14   (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a

15   viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

16   state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected

17   conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and

18   (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson,

19   408 F.3d 559, 567-68 (9th Cir. 2005).  To state a cognizable retaliation claim, Plaintiff must

20   establish a nexus between the retaliatory act and the protected activity.  Grenning v. Klemme, 34

21   F.Supp.3d 1144, 1153 (E.D. Wash. 2014).

22          To prove retaliatory motive, plaintiff must show that his protected activities were a

23   "substantial" or "motivating" factor behind the defendant's challenged conduct. Brodheim, 584

24   F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).

25   Plaintiff must provide direct or circumstantial evidence of defendant's alleged retaliatory motive;

26   mere speculation is not sufficient. See McCollum v. Cal. Dep't Corr. Rehab., 647 F.3d 870, 882-

27   83 (9th Cir. 2011); accord, Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014). In addition to

28   demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of

1   motive may include: (1) proximity in time between the protected conduct and the alleged

2   retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence

3   showing that defendant's reasons for the challenged action were false or pretextual.  McCollum,

4   647 F.3d at 882 (quoting Allen v. Iranon, 283 F.3d 1070, 1077 (9th Cir. 2002)).

5          1.      Rules Violation Reports May 2015

6          In the operative complaint, Plaintiff alleges that on April 23, 2015, under the auspice of

7   enforcing CDCR security check, Gonzales stated in front of general population inmates that

8   Plaintiff was a "SNY" "piece of shit" "rat" who has "been 'snitching' on us to the sergeant."  On

9   May 5, 2015, Navarro called Plaintiff a "snitch" in front of general population inmates and stated:

10  "Drake, in cell #48, keeps snitching on us [guards] to the sergeant and captain…writing

11  complaints," and "if you guys (e.g. black inmates) don't handle it, we are going to handle it!"  In

12  addition, Gonzales called Plaintiff a "snitch" "SNY," "piece of shit" in front of the general

13  population inmates.   On May 20, 2015, Defendants Gonzales and Navarro took Plaintiff from

14  cell #48 to a hallway holding cage/cell to collect a urine sample from Plaintiff under the threat of

15  discipline.  Plaintiff told Defendants Gonzales and Navarro that he "filed a 602 against the

16  Warden for his wasting human-resources by unnecessarily repeatedly drug-testing [him], a non-

17  user because it is harassment."  Defendant Gonzales, without notice, left the 2 on one 1 escort,

18  after hearing Plaintiff speak of having filed a staff complaint.  After Plaintiff provided a urine

19  sample and was placed in a rotunda holding cage, Plaintiff asked Navarro, "Why am I not being

20  taken back to my cell?" Navarro told Plaintiff "you have to wait here until my partner Gonzales is

21  done searching your cell."   Gonzales remained in Plaintiff's cell for approximately thirty to forty

22  minutes, ransacking Plaintiff's property then returned to the rotunda with two fifty-gallon trash

23  bags and refused to disclose the contents.  When Plaintiff asked what items were taken, Gonzales

24  stated, "you had a lot of trash! Just stand there and shut the fuck up! I read your legal papers, and

25  what you write isn't worth shit! You are not on my level yet, I know exactly what to say in court

26  to win!"  Gonzales further stated, "Oh, if you want to see 'personal,' I will get you struck-out! I

27  have already gotten four prisoners life sentenced and I'll be glad to make you the fifth!"

28  Gonzales then told Plaintiff to "turn around and cuff-up…if you so much as look at me, I will

slam you onto the floor head first!"   On May 21, 2015, Gonzales threatened to charge Plaintiff for the lost state linen taken from a different prisoner's cell on May 20, 2015, if Plaintiff filed an inmate grievance regarding the search of his cell.   On May 21, 2015 and May 28, 2015, Gonzales filed two retaliatory Rule Violation Reports (RVR) against Plaintiff regarding the May 20, 2015 escort.  Gonzales accused Plaintiff of destroying state property and willfully resisting and delaying a peace officer in the performance of his duties.

Here, it is undisputed that prior to April 6, 2015, Defendant Gonzales was unaware of any grievances submitted by Plaintiff against Gonzales or correctional staff members concerning alleged deprivations of in-cell air circulation, bedding, linen, or sink sanitation.  (UF 34.) Gonzales was not involved in selecting inmates to submit to urine tests. Officers at the Investigative Services Unit (ISU) selected the inmates required to submit to urine tests and instructed Correctional Officers such as Gonzales to escort them for the tests.  (UF 35.)

In May 2015, Plaintiff was housed in the SHU, and the practice at that time was to randomly search three cells each day, and to ensure that each cell was searched at least once a month, due to the enhanced security issues posed by inmates housed there. These searches were conducted when the inmate was out of the cell in order to maintain the safety of the officers as much as possible.  (UF 36.)  In 2015, Gonzales did not attempt to lure Plaintiff out of cell his for the purpose of having him attacked by other inmates, either in retaliation for protected conduct, as part of a conspiracy, or otherwise.  (UF 37.)

It is undisputed that on May 20, 2015, Plaintiff was issued a Rules Violation Report for willfully resisting, delaying a peace officer in the performance of duty.  Defendant Gonzales declares that on May 20, 2015, he conducted a random search of Plaintiff's cell for the purpose of determining whether he possessed any weapons, drugs, or other types of contraband as defined under Title 15 of the California Code of Regulations.  (Gonzales Decl. ¶ 6.)  Gonzales further declares that "[a]fter completing the search, Plaintiff refused to return to his cell.  I ordered him to submit to handcuffs so that the correctional staff could start running committees for other inmates but Plaintiff refused to do so for approximately forty-five minutes.  For this reason, I issued a Rules Violation Report (RVR) for Willfully Resisting, Delaying Any Peace Officer in the

1  Performance of Duty."  (Gonzalez Decl. ¶ 7.)  However, Plaintiff disputes that he was resisting

2  and/or delaying the officer and claims the Rules Violation Report was issued in retaliation for

3  having filing grievances.

4        There are disputed facts about whether the conduct occurred and whether it was done in

5  retaliation.  Plaintiff contends on April 23, 2015, under the auspice of enforcing CDCR security

6  check, Gonzales stated in front of general population inmates that Plaintiff was a "SNY" "piece

7  of shit" "rat" who has "been 'snitching' on us to the sergeant."  On May 5, 2015, Gonzales called

8  Plaintiff a "snitch" "SNY," "piece of shit" in front of the general population inmates.   On May

9  20, 2015, Defendant Gonzales and Navarro took Plaintiff from cell #48 to a hallway holding

10 cage/cell to collect a urine sample from Plaintiff under the threat of discipline.  Plaintiff told

11 Defendants Gonzales and Navarro that he "filed a 602 against the Warden for his wasting human-

12 resources by unnecessarily repeatedly drug-testing [him], a non-user because it is harassment."

13 Thereafter, Plaintiff's cell was searched and he was charged with, among other things, resisting

14 and/or delaying a peace officer in the performance of his duties.  While this evidence is by no

15 means conclusive of retaliatory motive, viewing the facts in the light most favorable to Plaintiff,

16 the timing of events combined with the statements allegedly made by Defendant Gonzales are

17 sufficient to raise a triable issue of fact regarding Defendant Gonzales's motives. See Bruce v.

18 Ylst, 351 F.3d 1283, 1289 (9th Cir.2003) (statements and suspect timing raised triable issue of

19 fact regarding whether the defendants' motive behind plaintiff's gang validation was retaliatory).

20       With regard to the Rules Violation Report in May 2015 for destruction of state property,

21 Defendant Gonzales denies issuing such violation.  (Gonzales Decl. ¶ 10.)  However, Plaintiff has

22 submitted a copy of Rules Violation Report No. 4A2-15-05-44, dated May 26, 2015, signed by

23 Defendant Gonzales.[6]  (ECF No. 138, Ex. O.)  While Defendant claims it appears this document

24 was forged, Defendants have not adequately addressed the issue and the Court cannot resolve

25 such issue by way of summary judgment.  Plaintiff further submits the declaration of fellow

26 inmate Kevin Fields who declares that on May 21, 2015, he heard Defendant Gonzales tell

27

28 [6] In addition, Plaintiff submits two CDC 128B forms referring Rules Violation Report, Log No. 4A2-15-05-44 and
   Log No. 4A2-15-05-45 (ECF No. 138 at 124-125), which Defendants do not address.

Plaintiff to sign a trust withdrawal form so he could be charged for altered state property.  (ECF No. 138 at 106-107.)  Fields then heard Plaintiff ask Gonzales, "why are you charging me?  Yesterday you said there would be no Rules Violation Report ("RVR") if no 602 appeal is submitted."  (Id. at 107.)  Gonzales then stated, "Okay, then I'll just hold on to this trust withdrawal form for 30 days to make sure that no 602 gets filed by you."  (Id.)  In addition, Defendant Gonzales denies reading Plaintiff's legal mail during the search of his cell, but Plaintiff claims Gonzales admitted to such. Fed. R. Evid. 801(d)(2).

If Defendant Gonzales did not issue the Rules Violation Report on May 26, 2015 and did not make the statements on April 23, 2015 and May 5, 2015, then there was no constitutional violation. If Plaintiff's facts are true and Gonzales issued the Rules Violation Report and made the derogatory comments in retaliation for Plaintiff filing inmate grievances, then a jury could conclude there was a constitutional violation.  If the Rules Violation Report was false and issued out of retaliation then there was no legitimate penological purpose for it.  For these reasons, summary judgment should be denied for Defendant Gonzales with respect to this Rules Violation Report and comments he made on April 23, 2015 and May 5, 2015.

Although Defendants argue that it appears the Rules Violation Report is forged because the log number is crossed out and replaced with a different log number, the document was signed by a reviewing supervisor before the reporting officer, referring the dollar amount of property destroyed, there is no record of this Rules Violation Report ever being adjudicated, and does not contain Gonzales original signature (ECF No. 141, Williams Decl. at 2:6-15, Ex. O; Classification Review at pg. 4, Ex. P), Defendants have not adequately addressed this factual dispute and such discrepancy speaks to the weight and credibility of the document.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) ("[A]t this [summary judgment] stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions.") (internal citation omitted).

2.      Rules Violation Report June 2015

Plaintiff alleges that on June 28, 2015, Gonzales told Plaintiff to prepare for the RVR

hearing, and then told Plaintiff "wait, let me go see if the Lt. wants to deal with this shit."

Gonzales falsely told the Lieutenant that he "refused to attend" the hearing.  Plaintiff was not

allowed to attend the RVR hearing, and Gonzales posted a disciplinary penalty sign on his cell

door and took his television.  On June 29-30, 2015, Defendants Gonzales and Navarro disciplined

Plaintiff outside of the disciplinary process by extending his penalty absent authorization of a

disciplinary order.

Defendant Gonzales argues that he did not discipline Plaintiff outside the disciplinary

process by extending a loss of privileges and did not make an untrue statement that Plaintiff

refused to attend a disciplinary hearing in retaliation.

The evidence before the Court demonstrates that Plaintiff's television was removed by

non-party correctional officers Trujillo and Monroe, and not Gonzales.  (Ex. N, Cell/Locker

Search Notice, dated June 30, 2015.)  In addition, the Rules Violation Report dated June 28,

2015, states that Plaintiff had been informed of the disciplinary hearing by the non-party Senior

Hearing Officer E. Castro who then informed Castro that he refused to attend the hearing.  (ECF

No. 134-3 at 138.)  The forms indicating that Plaintiff had refused to attend the hearing, which

were also signed by non-party officer Lassey, merely document what Plaintiff stated to non-party

Castro.  As such, Plaintiff's allegations are contradicted by the record evidence, and he fails to

raise an issue of material fact on this claim.[7, 8]

---

[7] There is no evidence to support Plaintiff's allegation that on July 7, 2015, Defendant Gonzales threatened to apply
pepper-spray to Plaintiff in retaliation for filing an inmate grievance.  Plaintiff has failed to provide any evidence,
other than the complaint, to support his claim. See Rivera v. AMTRAK, 331 F.3d 1074, 1078 (9th Cir. 2003)
("Conclusory allegations unsupported by factual data cannot defeat summary judgment."); F.T.C. v. Publ'g Clearing
House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997) ("A conclusory, self-serving affidavit,
lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").  The
fact that Plaintiff relies upon the allegations of the complaint in his opposition to Defendants' motion for summary
judgment does not convert these statements from self-serving affidavits to factual data or supporting evidence.
Accordingly, there is no genuine issue of material fact on this claim.

[8] There is also no evidence on September 5, 2015, Defendant Gonzales stood at the Plaintiff's cell door and stated:
"You have an 'R' suffix in your file right?  What does the 'R' stand for?  You are a sex-offender.  My job here is to
make the life of pieces of shit like you miserable!"  Defendant declares such statement was not made and he was not
working at Corcoran on this date (Gonzales Decl. at 4:1-4), and there is no evidence to support the statement was
made in retaliation than Plaintiff's allegations in the operative complaint. See Rivera v. AMTRAK, 331 F.3d at 1078

33

1          7.    Qualified Immunity[9]

2          The defense of qualified immunity protects "government officials ... from liability for civil

3   damages insofar as their conduct does not violate clearly established statutory or constitutional

4   rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818

5   (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who

6   knowingly violate the law.' " Saucier v. Katz, 533 U.S. 194, 202 (2001) (quoting Malley v.

7   Briggs, 475 U.S. 335, 341 (1986)). Defendants can have a reasonable, but mistaken, belief about

8   the facts or about what the law requires in any given situation. Id. at 205. A court considering a

9   claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of

10  an actual constitutional right and whether such a right was clearly established such that it would

11  be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. See

12  Pearson v. Callahan, 555 U.S. 223, 236 (2009) (overruling the sequence of the two-part test that

13  required determining a deprivation first and then deciding whether such right was clearly

14  established, as required by Saucier). The Court may exercise its discretion in deciding which

15  prong to address first, in light of the particular circumstances of each case. Pearson, 555 U.S. at

16  236.  The Court must view the evidence in the light most favorable to the plaintiff. See Martinez

17  v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

18          Here, Defendant Gonzales does not argue he is entitled to qualified immunity on this

19  theory of the retaliation claim, and therefore it remains. (ECF No. 134 at 24-26.)  Even so, as

20  discussed above, Plaintiff's allegations of retaliation raise questions of fact that preclude

21  summary judgment. In addition, the factual determination of Defendant's motive for issuing the

22  Rules Violation Reports prevents a finding that Defendant is protected by qualified immunity

23  upon the record presently before the Court.

24  ///

25  ("Conclusory allegations unsupported by factual data cannot defeat summary judgment."); F.T.C. v. Publ'g Clearing

26  House, Inc., 104 F.3d at 1171, as amended (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed
    facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").  Accordingly, there is

27  no genuine issue of material fact as to this claim.

28  [9] The Court need only address Plaintiff's retaliation claim against Defendant Gonzales, as the Court recommends
    summary judgment be granted in favor of Defendants on all other claims.

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment be DENIED as to Plaintiff's retaliation claim against Defendants for issuance of Rules Violation Reports in May 2015 and GRANTED as to all other claims.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 15, 2024**

_____
UNITED STATES MAGISTRATE JUDGE